22-3390 Deanna L. Puskas v. Delaware County OH et al. Oral argument not to exceed 15 minutes per side. Ms. Varner for the Plaintiff's Counsel. Good morning, Your Honors. My name is Carrie Varner. I am from the Ohio Bar 0068120. I do represent Deanna Puskas and the estate of who we're here about is Brian Puskas. This gentleman is now deceased. He's deceased at the hands of the Delaware County Sheriff's Department. He was killed in what would have been a routine call. It became a critical response situation and was definitely a situation that Mr. Puskas needed not the guns drawn on him but the help of this department that fateful day. The call started with a 911 but days before there had been other calls that were made with calls about the mental health deterioration of this gentleman. A gentleman who for years had been a law-abiding citizen of Delaware County had been a citizen who had gotten no more than a driver's speeding ticket with this county or any state or any law of this United States. But on that day was treated like a common criminal instead of getting the assistance when a mental health crisis started to exist in his life. Overnight with some medication, the wife had testified and had told everyone, had told the 911 that her husband had reacted to a medication that had had a mental health issue and had been citing some very scary situations to her. That had said that she was going to make her an ashtray, had been throwing things in the yard, had been acting what she called erratic. Erratic because it wasn't normal for this gentleman. This was a situation that all of us in any situation with our brains could overnight experience ourselves and become something that we are not. And at one point is the question as to when this department had the right to pull a gun on this gentleman, to stick a dog on him, to scare him more than he already was. To take advantage of this. He had a couple of guns out there too. No your honor, that is a disputed fact. These were issues, the findings that were reached by this district court were done, there was, I'm wanting to make a list here, 8,000 pages of testimony. She never said that she feared for her life or words to that effect. She never said that she feared for her life. She called 911 for the assistance to help her husband. She ran to a... She threatened her with weapons. I'm sorry what? Hmm? I didn't hear your question, I apologize your honor. The 911 call said the wife was being threatened with weapons. The wife never said that she was being threatened with weapons. That's what the facts seem to say. That is what the district court said. That is an issue that the district court drew a conclusion on disputed facts. Where did we get that information, the district judge? The district court had 8,000 pages of testimony, 20 depositions. And there were different versions of it. There was a 911 call. And if you were to listen to that 911 call, you would hear a wife that is asking for the help of the department, not for her protection, but to help her husband who was acting erratic, who had lost his mind, who had been not... She felt threatened enough to run away from him, yes. But she also went for safety. She called 911. She was asking for their assistance. She told them of his mental health issue. She told them that this was something that was new to them. This is not something that these officers should have come out with guns drawn. There were not... Who testified on the deposition that she said she was being threatened with weapons? I don't believe that she had ever testified to that, Your Honor. What she had done, and there was an affidavit before this court, she had said... that people are saying that the district judge is making up stuff. Nobody ever thinks... I would never say that any judge would make up anything. What I do think is... This came from somewhere. What I do think is this was an issue on summary judgment, that this was not any testimony where there were difference of opinions that were given where that judge could have weighed credibility by the testimony given under cross-examination. I think that there was not a day of court that this court actually took all the evidence in its fruition and actually evaluated it first hand. What I do think is that this court had 8,000 pages of testimony and evidence before it. I think that this court had 20 depositions that were before it. And can a judge make a mistake? Yes, Your Honor. And that is what... I would never say that a judge ever did anything intentionally. I don't think this judge knew any of the parties in this situation. I think, though, what happens is that sometimes what can happen is a judge can reach a conclusion and then affirm that decision by using bigger words than the evidence supported. Well, didn't the 911 call... Even if she didn't say that specific thing, didn't she say that he threatened to turn her into an ashtray, which I think is something that you mentioned here, and that she also informed the 911 dispatcher that there were lots of guns and knives in the house? She did inform them because it's a standard question that if there were guns there. He is a hunter, so he does have guns. There were guns in the house, but there were not guns in the yard, Your Honor. Okay, I ask those factual questions because if you have just those two things together, I don't know what it means to turn someone into an ashtray, but it doesn't sound like a nonviolent thing. And that combined with information that there's lots of guns and knives in the house is information that the officers responding on the scene are taking into consideration as they are addressing the individual, regardless of whether or not there are mental health issues, correct? Regardless of the mental health. I don't think we should ever say regardless of mental health. I think that when we say these and we look at these situations, we walk into there is a life of an individual standing there, and that life, whether with mental health issues or whatever makes up that life and how that's being addressed, needs to be responded to in an appropriate manner. And that's the concern here. Well, when I say mental health, let me be clear. When I say that, I'm saying that the officers were required to still take into consideration the safety of everyone who was present at that scene, correct? Yes, Your Honor. Yes, and that's what I'm asking for, is for this court to consider the law as it was developed. It was done so amazingly. The police officers tried to do exactly what you said. Were they, Your Honor? They said, let's talk about this, let's figure out what's going on. Come on, partner. Come up here and talk to me. I understand you're having a tough day. Why don't we talk about it? That's exactly what you wanted them to do? When the initial officer first arrived, Mr. Pouskas was standing with a, I think it was the word, the rifle. And he had actually set that rifle down, came out to talk to the officer, set it down because of the way that the officer was handling him appropriately. That officer, when he first arrived on that scene, handled it very well. What happened is the response they got from Mr. Pouskas at that time, he put down the rifle, walked out into the yard, had his hands empty of anything, was standing there, was cooperating, was talking to them. What did he say to the officer? He said, you better not come at me or something like that. This is a gentleman who was suffering from a mental outbreak. I know, and the officer was trying to get him to talk to him. He was, and they were trying to talk. The impression he got was I'm going to, if you come towards me, I'm going to take you out sort of. What went from, at one point, the initial officer was so close, he could have tased him and taken him at that point and taken care of the whole situation, could have taken him under control. What happened was additional officers came. The situation quickly became very chaotic. The department as a whole and the way they responded to the situation actually took what the initial officer had drawn him out. The man was calm. He was out there. He was calm, and then created, and that's when chaos started, Your Honor. That is when everybody started screaming. If you listen to these recordings, there's a lot of screaming going on. You couldn't hear what was going on. When a person with a mental outbreak is facing, they go from calm. Calm is the way you help individuals with mental health, not chaos. Having been told there were a lot of weapons, they had to have additional police there, didn't they? They were told there was a lot of weapons, but what they viewed was things thrown all over that were cartridges, empty. You've got to have more police officers. I mean, if they didn't and he did shoot somebody, then you'd be here suing and saying they should have brought more police officers. When the police officers show up, it doesn't mean they show up to create a situation of chaos, that they don't learn to have proper training to handle the situation in a better manner. There was a better way of handling this. They should have shown up, and they should have kept the situation calm. They should have released a dog when appropriate. My favorite thing in this, and it's the funniest thing, they released a dog to subdue Mr. Pouskas at one point, which scared Mr. Pouskas, seeing a deadly dog running almost towards him. That dog immediately is my best witness in this case, Your Honor, because they said they released the dog because we have a very threatening type of individual standing there, but that dog actually chose to divert and go play with a shirt in the yard instead of taking down the individual. The dog never saw him as a threat, but immediately after that, Mr. Pouskas got shot in the back twice, four more times by guns, because he had turned to run from the dog, had been scared for his life because the dog had bent down and actually, for the first time, had went to touch and pick up a gun. He never brandished, he never aimed, he never got turned around to even put the officers in jeopardy. There were other ways of helping. It would have taken one bullet to take out his hand, to take that out, but they chose six that killed him. But one, and they did, one bullet hit his hand and took out the hand. That would have ended the whole thing. But they shot him and they killed him, because if they had not released that dog, because they didn't need to at that point, had the dog actually thought he was some sort of threat, but at the very beginning, why was this dog even released? They created a more chaotic situation, which led this individual to flee for his life, to try to defend himself from a dog that was heading towards him. Funny enough, the dog ended up going to play with his shirt, because the dog never saw him as a threat. The police officers, though, did, and they killed him. And that's the point of excessive force. That's the point of at what point and what choice should you have made early on as a police officer of how to handle that situation from the very beginning, knowing you were dealing with mental health, knowing to give that extra... Oh, I apologize, Your Honor. Thank you. Morning. Good morning, Your Honors, and may it please the Court. My name is Stephanie Schoolcraft, and I represent the appellees Delaware County, Ohio, Deputy Troy Gibson, Deputy Zachary Zwick, Sergeant Robert Swing, and Lieutenant David Butler. Your Honors, this Court should affirm the lower court's grant of summary judgment, because the body camera footage shows there are no genuine issues of material fact, and the deputies' uses of force against Mr. Peskis on June 6, 2018, were objectively reasonable. Furthermore, the absence of any underlying constitutional violation precludes any liability against the county. And there's no question that Mr. Peskis' death is a tragedy. However, it's important to remind Your Honors about the totality of the circumstances facing the deputies when they interacted with Mr. Peskis that day, all of which is depicted on the various officers' body cameras. I know Your Honors have access to the body camera footage, but I would like to highlight some facts, in particular some facts that you discussed with my colleague here earlier. The officers were informed that this was a domestic violence situation where Mr. Peskis had threatened his wife with weapons, knives, and guns, and that there were many guns inside his home. If you look at Exhibit 29 to Apelli's brief, that is a recording of the 911 call. At 10 seconds to 20 seconds, there is Mrs. Peskis telling the dispatcher that Mr. Peskis was threatening her with guns and knives, saying that she also reported that he's going to kill me and turn her into an ashtray. And again, that's between 10 seconds and a minute and 32 seconds on that 911 recording. The deputies were not aware of where Mrs. Peskis was located at the time they responded. And prior, in the moments and minutes prior to the deployment of Deputy Gibson's canine partner, Cash, the officers had continuously commanded Mr. Peskis to come towards them and away from the house where they knew Mr. Peskis had access to weapons. Additionally, Mr. Peskis had previously brandished a firearm and picked up a shotgun, and that is depicted in Deputy Zwick's body camera at 3 minutes and 51 seconds to 4 minutes and 1 second. It cannot be disputed that Mr. Peskis had access to weapons all over the lawn, as well as within the home. The officers were concerned that if Mr. Peskis was able to retreat into his home, it would turn into a barricaded suspect situation. Mr. Peskis continued to disobey their commands, walking around the lawn and towards various objects on the lawn, including a rifle. He was explicitly ordered not to pick anything up. He disregarded this, he picked up a T-shirt, threw it at the officers, and at that point the deputies began ordering him to get on the ground. Rather than comply, Mr. Peskis backed away from the officers towards his home, and then turned and ran towards the home. Now approximately 17 seconds elapsed between when Mr. Peskis backed towards his home, turned and ran away from the officers, and when the officers discharged their weapons. Unfortunately, K-9 Cash did not engage with Mr. Peskis. That was a less lethal option the officers were trying to use to apprehend him. And as Mr. Peskis got closer to his home, as you will see on the video, Mr. Peskis veered behind a tree and chose to reach down and pick up a black pistol case and pull out a pistol. The officers ordered Mr. Peskis to drop that weapon, and Mr. Peskis did not. And fearing for the lives of themselves as well as everyone on the scene, including Mrs. Peskis, the deputies made the decision to discharge their weapons at Mr. Peskis to end the threat, because Mr. Peskis posed to everyone on the scene that day. And this court, as we know, uses a segmenting analysis when looking at the various uses of force. There are two at issue here, the first being the decision to deploy the K-9, and application of the three Graham v. Connor factors establish that it was objectively reasonable, in light of the totality of the circumstances, to deploy K-9 cache. Mr. Peskis was suspected of committing crimes, serious crimes. He had threatened Mrs. Peskis with weapons. He had access to weapons on the lawn. He had already brandished a rifle and a shotgun in Deputy Zwick's presence. He also posed a threat of harm to the deputies. He had access to a gun at the front of the lawn, near where the officers were located. Mr. Peskis also could retreat into his home and barricade himself inside the home. And he was actively resisting arrest. I believe that plaintiff's counsel, maybe not at podium, but in briefing, makes the point that there was the point at which cache was, for lack of a better word, sicked or triggered to go out there. Mr. Peskis was about six feet, I believe, away from the officer, and a taser could have been deployed. Should we be concerned with that possibility? No, Your Honors, because at that point in time, Mr. Peskis was close in proximity to a rifle, which he could have reached out and grabbed, even though he was also close in proximity to the officers. And as you can see on the video, the decision, the actual deployment of cache, did not occur until after Mr. Peskis had retreated, started backing away, and then running away from the officers. So there was no ability to tase him and safely apprehend him. Additionally, it isn't the best use of force, so long as the use of force used was reasonable under the circumstances. And here, canine cache was being used as a less lethal option. And the district court's decision, finding the decision to deploy cache as objectively reasonable, is consistent with and supported by the circuit's precedent. This court has previously concluded that officers are justified to use a canine to apprehend a suspect who has failed to surrender and has not yet been apprehended, and that was the circumstances facing the officers here. They needed to be able to control the scene, and they could not do so while Mr. Peskis remained on the lawn. Mrs. Peskis fails to point this court towards any disputed evidence that defeats Deputy Gibson's entitlement to immunity for his decision to deploy cache, and as such, this court should affirm the lower court's grant of summary judgment on that issue. Now, turning to the application of deadly force here, the deputy's decision to use deadly force after Mr. Peskis deliberately chose to arm himself with a pistol was objectively reasonable. At that point, they had probable cause to believe that Mr. Peskis posed a threat of serious physical harm to themselves and everyone on the scene when he picked up that weapon. The totality of the circumstances facing the deputies would cause a reasonable officer to perceive a serious threat of harm to themselves or others. They were in close proximity to a suspect who could quickly and easily fire a gun with little or no time and transform a deadly threat into deadly action. And Mrs. Peskis's arguments that Mr. Peskis's failure to point the gun at the deputies deems their decision to use deadly force unreasonable directly contradicts this court's precedent that does not require deputies to wait and see if Mr. Peskis would point a gun at them. Additionally, this court should not entertain Mrs. Peskis's newly articulated theory that a different standard for the use of deadly force should be applied here because Mr. Peskis was suffering from a mental health emergency. This argument was never presented to the district court, and new theories or arguments may not be raised on appeal when they were not advocated for in the trial court. But even if such a standard is applied here, that does not deprive these deputies of qualified immunity because their actions were still objectively reasonable. This case falls squarely within the line of cases and category of cases where courts found officers reasonably used lethal force against a mentally ill person because the person was armed and threatening officers. And that's exactly the circumstance that was facing these officers here. Mr. Peskis chose to arm himself with a weapon after the deputies were trying to apprehend him. And yet again, Mrs. Peskis fails to point this court to disputed material facts or applicable precedent that deprives these deputies of qualified immunity for their decision to use deadly force against Mr. Peskis. As such, the lower court's decision should be affirmed. And again, the absence of any underlying constitutional violation  Your Honors, do you have any additional questions for me regarding the facts or the case law? Apparently not. All right. Thank you for your time, Your Honors. I appreciate it. Thank you. Any rebuttal? What I would press is that earlier this year, this court decided a case of the Palmer versus I'm so sorry, Palmer versus Johns, sorry. And that wasn't something of like overnight this court decided. It was a line of thinking that had developed that Your Honor wrote such an elegant decision in that and had put it out for all of us to learn from that showed the development of the law from Graham all the way to that case and when that was issued that had a mental health component that said the totality of the circumstances that we're talking about is basically a larger situation that we need to consider, that every individual situation that is walked into is a crisis. It is a life to be considered and everything should be considered. We most definitely argued this at the district court. This court was very aware, the district court was aware that this was a mental health issue, that there was a critical response issue that should have been handled, that there was a better way of handling it until you use death before you take out a life, before you take care of the problem by taking out the person and doing a judge, jury and conviction all in one with a gun. You use everything that is available to you. Counsel was wrong. It is the, there was testimony already given and it might have been disputed and that should have been an issue for trial, but they knew where Deanna was. They knew she was safe. They came into the situation and they created chaos instead of controlling the situation, which would have been the proper. That is one of the arguments that we were making about training. The department should give more training. There should be more training in this area. This needs to be a strong message coming from the courts that you need to train least restrictive measures to be taken. Tasers don't take lives necessarily unless they're used wrong. Tasers can control a person. One bullet can control a person. You don't need to take their life to control them. You can use things. There is training. There is guns. Everybody was certified with their gun. They could have shot him in a way. He had not turned on him. He did not have it under control. He did not brandish. There were so many words used by the district court in their decision that had not been supported by the evidence. This gentleman to brandish a gun to aim it means to turn and arm it and be deliberate in your choice of your target. That is not a situation that this was a person who had been a dog sick on him, turned, bent down to get the one gun that was in the yard. There were inventories produced for this court, and there was one gun, and that was the one that he did go to grab. The rifle that was in there was a replica. There was discussion between everyone that it was just a toy, that it was a replica. There were pieces. There were cartridges thrown all over, but they were not guns put together. The only armed thing was that gun, and he did reach down, and that is not disputed. But there were least restrictive ways to have controlled it leading up to that faithful second. There was no reason to get there, Your Honors, and I ask this court to please follow with its line that it did earlier this year to say to the district courts, you need to look at more than what you did in this situation. Before you reach the conclusions of the facts and the conclusions that you reached on this, before you try to affirm by jumping on big words like brandish and things like that that this district court did to say these things about Mr. Puskas, that were not true. There were disputed issues. There were other people that said he didn't brandish. There were other people that said there were not all guns in the shard. There were people that said we know where Deanna is and she's safe. There was other evidence to be considered. District courts should have given the day in court, should have considered the totality of the situation, considered what measures should have been taken for a situation with mental health, and should have done a better way of deciding this case. Thank you. Please reverse the decision of the district court. Thank you very much, and the case is submitted.